# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WILSON, Minors.

UNPUBLISHED
May 26, 2016

No. 328388
Wayne Circuit Court
Family Division
LC No. 15-518699-NA

Before: GADOLA, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her sons CW and EW pursuant to MCL 712A.19b(3)(b)(*i*) (parent causes physical injury), MCL 712A.19b(3)(b)(*ii*) (parent fails to prevent physical injury), MCL 712A.19b(3)(g) (failure to provide proper care and custody), MCL 712A.19b(3)(j) (reasonable likelihood of harm), and MCL 712A.19b(3)(k)(*iii*) (parent causes severe physical abuse).[1]  For the reasons stated in this opinion, we affirm.

On December 3, 2014, respondent went to work, leaving her children at her home with two live-in babysitters, Curtis Lee and Angela Taylor.  Respondent testified that while she was working, the babysitters called and told her that EW was hurt.  Respondent returned home and, because EW had a big bruise above his eye and was not walking, she took him to the hospital.  At that time, EW was given ibuprofen and sent home.  Respondent testified that she followed up with EW's pediatrician on December 5, 2014.

According to Kimberly Spencer, a Child Protective Services (CPS) investigator, the police performed a wellbeing check on the children on December 3, 2014.  Two days later, on December 5, 2014, Spencer made an unannounced visit to respondent's home to address allegations that the children were being put in the closet and that there was domestic violence between respondent and her boyfriend, Jordan Sosa.  Sosa was living with respondent, and during the visit, respondent denied that she had been the victim of domestic violence.  She later testified that the reason she denied the allegations of domestic violence was because Sosa was in the room during the visit.  Spencer, however, testified that Sosa was not in the room when

---

[1] The trial court also terminated the parental rights of EW's putative father and CW's legal father, neither of which has appealed the decision.

-1-

respondent denied the domestic violence allegations. She also testified that respondent's "perfectly normal" demeanor did not change when Sosa entered the room. Spencer testified that, at that time, she was satisfied that there was no domestic violence between the two; however, she followed up with the police department and learned that there had been no domestic violence runs to respondent's home.

Respondent testified that, because she did not know what happened to EW, she kicked Sosa and the babysitters out of her house, quit her job, and stayed home with the children. She testified, however, that she could not keep Sosa away. According to respondent, Sosa beat her dozens of times and would kick or rip open her doors. She testified that she called the police numerous times, but that they did not do anything, only advised Sosa to stay away, and made things worse for her. She testified that she did not report the domestic violence to Spencer when Sosa was not around because she was afraid.[2]

On January 5, 2015, respondent took EW to the hospital again. After medical personnel determined that EW had fractured bones in both legs, he was transferred to the Children's Hospital of Michigan, where he remained for three days. Dr. Brian Park a pediatric emergency medicine physician at the Children's Hospital, testified that EW had a fresh fracture on his left lower leg, a healing fracture on his right leg, fractures on his ribs, and a skull fracture at the base of his skull. He testified that the fractures suggested non-accidental trauma because there were multiple fractures and they were in non-typical areas for a mobile 22-month old child. Dr. Park opined that the fractures would be painful to a child.

Spencer testified that she met respondent at the hospital to discuss the new allegations. At the termination hearing, respondent testified that she did not have an explanation for the fractures. However, she thought one leg fracture could have been caused by EW climbing a dresser and falling and the other leg fracture could have been caused by CW jumping on EW. She testified that the rib fractures could have been from Sosa stomping on EW, and she added that, although she did not see such an incident, CW told her it happened. She believed that the skull fracture was from CW hitting EW with a toy truck.

Dr. Park, however, opined that while it was possible that CW caused the leg fracture, it was unlikely that he caused the skull fracture. He explained that the most likely causes of a skull fracture were non-accidental trauma or a car accident. Dr. Park added that any indentation in the skull was "pretty severe" and was a "very significant injury" in a 22-month old child. He also

---

[2] Respondent testified at length about additional domestic violence that occurred between her and Sosa after the children were removed. She testified that Sosa punched her on Easter, bruising her face while witnesses were present. She said no one called the police. She testified that, about a week later, Sosa showed up at her house around 3:00 a.m. and kicked in her back door. She testified that he stayed for five hours, ranting, raving, and arguing with her. She testified that she put her four dogs in her bedroom and went to sleep. She testified that Sosa also got into bed and that she had sex with him out of fear. She stated that she did not call the police when he arrived because Sosa took her phone; however, she testified that around 8:00 a.m., when her mother arrived, her mother called the police. Sosa was arrested at that time.

opined testified that it was "highly unlikely" that EW jerked his head back hard enough to cause the fracture.

On January 8, 2015, petitioner filed an initial petition seeking termination of respondent's parental rights to CW and EW because of allegations of severe physical abuse. Following an adjudication and termination hearing, the trial court found grounds for jurisdiction under MCL 712A.2(b), grounds for termination under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*), and that termination of respondent's parental rights was in the children's best interests. This appeal follows.

Respondent first argues that the trial court clearly erred in finding that MCL 712A.19b(3)(b)(*i*), (b)(*ii*), and (k)(*iii*) had been proven by clear and convincing evidence.[3] We disagree.

MCL 712A.19b(3)(b)(*i*), (b)(*ii*), and (k)(*iii*) provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.
>
> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.
>
> * * *
>
> (k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:
>
> * * *

---

[3] This Court reviews for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence. MCR 3.977(K); *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 296-297.

(*iii*) Battering, torture, or other severe physical abuse.

The record establishes that EW sustained fractures to his skull, legs, and ribs. Dr. Park testified that the injuries were likely caused by non-accidental trauma, would be painful to a child, and that the skull injury, in particular, was a very serious injury for a 22-month old child. The trial court found that the injuries were either caused by respondent or by Sosa. Respondent argues that these grounds were not established, however, because there was a lack of direct evidence that she was the perpetrator of the harm directed against the minor child or that she failed to protect him. Her argument fails to take into consideration past precedent of this Court. First, termination of parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), and (k)(*iii*) "is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries." *In re Ellis*, 294 Mich App at 35-36; 817 NW2d 111 (2011). Second, this Court has upheld terminations in the absence of determinative proof regarding the identity of the abuser where the evidence supported a finding that the child's severe physical injuries were either intentionally inflicted by the respondent or caused by the respondent's failure to prevent the injuries. See *In re VanDalen*, 293 Mich App 120, 140-141; 809 NW2d 412 (2011). Here, the evidence established that after December 5, 2014, respondent kicked everyone out of her house and was the children's sole caregiver. She testified that Sosa, however, continued to come into the house. She testified that he was abusive to her, beating her multiple times and kicking open her door, but she took no steps against him until after the children were removed from her home.[4] She also testified at trial that Sosa caused at least some of EW's injuries by stomping on him, an allegation that she did not present in the five months between the children's removal and the date she testified at the termination hearing. There was also testimony from Lee, one of the babysitters, that respondent was aware that Sosa struck CW with a belt on at least one occasion and, rather than call the police, respondent attempted to address the situation herself. Thus, on this record, we find no error in the trial court's determination that grounds for termination were established by clear and convincing evidence under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), and (k)(*iii*).

Respondent's rights were also terminated under MCL 712A.19b(3)(g) and (j), which provide that termination is proper if there is clear and convincing evidence that:

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

---

[4] Respondent obtained a personal protection order (PPO) against Sosa on January 31, 2015. The children were removed on January 9, 2015.

-4-

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The same evidence supports termination on these grounds. EW sustained multiple fractures, requiring a three-day hospital stay. The fractures to his legs were in different stages of healing. The fracture to his skull was described as a significant injury for a 22-month old child. By her own testimony, respondent was the primary caregiver during the timeframe when he would have been injured. At trial, she speculated to various causes for his injuries, including that he fell from a dresser drawer, that his brother was too rough with him, and that Sosa had stomped on him. Significantly, respondent testified at length about her abusive relationship with Sosa, but she took no steps to protect the children from him and, in fact, denied that any abuse was happening when asked by Spencer. She asserted that she did not reveal the abuse because she was afraid, however, even after Sosa was arrested (apparently on a home invasion charge), she did not offer him as a possible source for EW's rib fractures until the day of the termination hearing. The record is devoid of any pre-removal steps that respondent took to protect the children from someone she described as beating her dozens of times. Likewise, assuming that EW's injuries were caused by his three-year old brother, CW, the record reflects that EW received multiple fractures in spite of respondent's efforts to keep the children separated. Additionally, presuming that EW's injuries were, in fact, caused by him climbing and falling from a drawer, respondent testified to no steps that she took to prevent him from climbing the dresser. Admittedly, Shirley Carr, a friend of respondent's, testified that respondent and her witnessed EW climbing the dresser and that they then repositioned it. However, assuming that was the only step taken to alleviate the harm, the fact that EW may have later climbed and fallen from the dresser suggests that the steps taken to alleviate the harm were, in fact, insufficient. For these reasons, the trial court did not err in terminating respondent's rights under (g) and (j).

Respondent also challenges the trial court's finding that termination of her parental rights was in the best interests of the children. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Respondent argues that the best interests determination was in error because there were no grounds for termination of her parental rights. Given our determination that the trial court did not err in finding grounds for termination, this argument is unavailing.

Respondent next argues that the trial court's best interests determination was erroneous because the trial court did not expressly identify the standard of proof applicable to the decision. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss Minors*, 301 Mich App 76, 90; 836 NW2d 182 (2013). Respondent asserts that because the trial court did not expressly state that it was a applying a preponderance of the evidence standard this Court cannot determine whether the trial court used a probable cause standard of proof when it made its best interests determination. Respondent has not directed us to any authority requiring the trial court to expressly identify the standard of proof before making a best interests finding. Nor do we find that our ability to review the record is impeded by the fact that the standard of proof was not stated on the record. In reviewing the trial court's decision, we are tasked with determining whether the trial court's

findings are supported by a preponderance of the evidence. Thus, if the trial court, in fact, used an improperly low standard of proof, such an error would become apparent upon review of the record. Accordingly, we find that respondent's argument lacks merit.

Respondent also argues that the trial court's best interests determination was clearly erroneous because the court failed to allocate adequate weight to the strong bond between respondent and the children. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (internal citations omitted). The trial court may also consider an unfavorable psychological evaluation, the child's age and a parent's continued involvement in domestic violence. See *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009).

Here, the parties presented no evidence regarding respondent's bond with her children. However, the record reflects that respondent sought to have her parenting time changed from once per week for three hours to twice per week for an hour and a half, so that she could see the children more often and maintain her bond with them. Nevertheless, a parent's bond with a child is only one factor that may be considered by the trial court. In this case, the trial court found that termination of respondent's parental rights was in EW's best interests because respondent could not be trusted to protect him from harm. The record reflects that while in respondent's care he sustained—at different times—a fracture to his right leg, a fracture to his left leg, fractures to multiple ribs, and a fracture to his skull. Respondent's response was to blame EW, CW, and Sosa for the injuries. The steps she allegedly took to protect EW from CW and from himself were ineffective, given that even after she was home fulltime, EW sustained additional fractures. Further, she took no steps to protect EW from potential abuse by Sosa. Instead, according to her own testimony, she would leave the children unattended with Sosa, even though he had beat her dozens of times and would not leave her home after she kicked him out. In particular, after EW's December 2014 hospital visit, respondent testified that she kicked everyone out of her house, including Sosa. She then told Spencer that in January 2015, she left Sosa alone with EW for fifteen minutes while she went to the store to purchase cigarettes. She then allowed Sosa to take CW to preschool even though, according to Lee, she was aware that Sosa had struck CW with a belt on at least one occasion. Although only EW sustained multiple fractures, the record reflects that respondent's parenting exposed CW and EW to a severe risk of physical harm because both were being cared for primarily by respondent, who left both in the care of someone she characterized as physically abusive. Accordingly, on this record, we conclude that the trial court did not clearly err in finding that termination of respondent's parental rights was in the children's best interest. Moreover, the trial court's finding was supported by a preponderance of the evidence.

Affirmed.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro